The next case is 24004 Wells versus Kawasaki Motor Corp. All right, we are ready to hear from Mr. Friedman. Thank you, Your Honor may please the court. My name is Ken Friedman. I'm one of Nicole Wells's attorneys, and I was one of her attorneys at the district court level as well. To avoid any confusion, I was not yet married, and her name was Nicole Ryder. So you'll see pleadings and documents in the record using both the name Ryder and Wells. As you know, this is an appeal from the district court in Utah granting summary judgment after the court excluded two of the plaintiff experts on liability. We appeal the exclusion of both experts and the subsequent grant on the motion for summary judgment. Ms. Wells was severely injured when as a passenger on a personal watercraft operated by her aunt, she slid off the rear of the personal watercraft and her lower body orifices came into contact with the jet thrust. This is known as orifice injuries. This is a known hazard in the industry. Kawasaki has decided to address it primarily through what is known as the uniform label, which is on personal watercrafts by all manufacturers. And it states that passengers and drivers are encouraged to wear protective clothing, specifically wetsuit bottoms or other clothing that will provide equivalent protection. I ask you real quickly just so that I have this sorted out. This distinction between sliding and falling. What do you mean by sliding? Do you mean her bottom slid on the seat and she went off? Or do you mean her back was wet from the swimming and so it slid off? Yeah, it was her bottom, Your Honor. And there is a dispute in the record. But for purposes of summary judgment and for evaluating our experts, it should be taken the light most favorable to Ms. Wells. And what she testified to and this is in the record at 2858, 2859 and 2953. So if I understand what you're trying to describe to me, you're showing your rear end slided backwards. Answer? Yeah. And then at 2859. And you rolled backwards. Is that what you're describing or slid backwards? Answer? I like slid. I just slid off. At 2953. Did you flip back or slide back? Answer? I slid back. So the record as she was asked about this in her deposition and the record is clear from her perspective. She simply slid off the back into the water. She actually described it or another witness described it with her. Her legs were apart and she she looked like a starfish as she entered the water. This is a known hazard. It's a hazard that's warned about. But our theory after discovery and fact and expert discovery was completed, was that it was negligent of Kawasaki to rely primarily on this warning when there were reasons to believe it would not be complied with and not try to design a product where this would be less likely to happen or guard against it. So under your under your theory, do you have to prevail on your failure to warn experts? Do you have to prevail on having your failure to warn expert testify before your engineering expert even matters? I don't think so. Your Honor, the the engineering expert, Mr. Dr. Kastabar can testify that the two alternative seats which I'll get to the the alternative seat would have protected would have offered more protection to Ms. Wells than the standards. So we have that evidence and jury can conclude from that, that there was negligence involved or failure of the standard of care even without our warnings expert, Dr. Kastabar is an accident reconstructionist as well as a mechanical engineer. And conversely, I think if if Ms. Gill is allowed to testify, even if Dr. Kastabar was excluded, we would be able to go to a jury on those facts. What we have in this case is both our liability experts were excluded. And I don't want to amplify your reasoning on the latter scenario that is that we agreed with you on bill but disagreed with you on Kawasaki, whatever his name is. Kastabar. Yes. Ms. Gill testified that it was a violation of the safety hierarchy, a well established principle of safety engineering to rely on warnings under these circumstances with no effort was made to design or guard. What what we then have is admissions by the designee of Kawasaki, Mr. Cato, who was at the 36 30 B6 witness, and he testified of the two seats that were both offered in the two third 2013 model year. It was feasible to use either seat on the model as well as was injured on. So we can get alternative feasible design without Dr. Kastabar. And a jury could conclude, simply based on the description of the observation of the two seats, that the the standard seat was negligent to use the standard seat when the other seat was more effective. The only the only testimony about the standard seat being less effective would have been Dr. Kastabar, right? That's correct. Your Honor, that's the only expert testimony. You know, Kawasaki certainly didn't endorse that theory. Right. So how do you win with your failure to warn expert without your other experts being able to testify that the design was bad, and that it should have been an alternate design? Well, the courts have ruled that where a where you don't need any specialized knowledge, a product defect can a jury can evaluate a product defect based on its common sense and own observations of the product. Now, I'll be honest, Your Honor, we have a much better case with Dr. Kastabar. But I don't think summary judgment would have been appropriate if if Miss Gill was allowed to testify. But Dr. Kastabar certainly was a important witness in our case. Right, because because Gill was not going to testify as to any design defect or whether whether the alternate seat would have been better or anything like that. Absolutely, that would have been improper. And she specifically said, I have no intention of doing that. So I mean, obviously, we're asking this court to overturn the district court on both on both experts into overturn the summary judgment decision. And I don't mean any disrespect to the district court. But these exclusion of these two experts is a significant departure from the Supreme Court's and this court's jurisprudence. There is nothing unusual or improper about the experts offered by the plaintiff. In this case, there are no red flags that would raise concerns about their opinions. The court's decision rested on two cases, Conroy and Mitchell, both of which are distinguishable, and I'll discuss those in a moment. But as the court stated, the 10th Circuit stated in Smith versus Ingersoll Rand, which is cited in that brief, the purpose of the by an inflexible set of criteria, but to undertake whatever inquiry is necessary to make certain that an expert whether basing testimony upon professional studies or personal experience, employs the same courtroom, employs in the courtroom, the same level of intellectual rigor that characterizes the practices of an expert in the relevant field. What what was the what was the background that Gil relied on in talk to any people who use these watercraft to see if they noticed or complied with warnings, right? Well, she read the deposition of people who use these watercrafts. These were people specific to the incident, though, right? Yeah. Okay. But like she didn't go try to take a sample of 100 people or whatever a statistically significant sample might be to determine if if they disregarded these warnings. Correct. And her opinion was, in contrast to some literature that suggested that the warning was appropriate. The literature suggested the warning was understood by people who read it, which is one part of it. But there is no literature that's ever been cited that I've ever seen. It says people comply with the warning. Okay, fair, fair enough. But she also didn't do any make any determination that people didn't read the warning. She did. But I don't think her opinion relied on that. Her opinion relies on the fact that people are not going to comply with a warning like this. Because of the factors that she said product, this perception that it's not going to be dangerous, the observations of other people using it without the safety precautions, all those things are known in the field of human factors as as indications about whether or not a person is going to comply with the warning. And you know, the Kawasaki did not say that that was a wrong conclusion or or offer a human factors expert to say that she did anything wrong about the way she analyzed the situation in what the district court said was was she never published she never published in her field, which is an inflexible application of the doublet standard. That's relevant, though, isn't it? Isn't that something the district court can consider as in the bundle of things that considers? Sure. But there are a variety of experts in a variety of ways you can prove that your opinions are reliable. I mean, you can go all the way back to to, you know, Kumo tire, and where they make the they use the example that a expert and smelling perfume can testify that two cents are different simply by basing on his experience. Or as we saw in the last case that was argued this morning, police officers can testify that a turn signal is less than two seconds. Two clicks is less than two seconds without publishing in that field. Experts get a lot of expertise through experience. And I was asked, you know, what was Miss Gill's experience that she brought to this and she's been working in a variety of applications in human factors for over 30 years and has advanced degrees in the field and is board certified as a human factors specialist. Well, he the court said that he was going to disallow her testimony because she did not have experience with jet skis. Correct. That's what he said. Well, and do you have to have experience in jet skis to talk about product liability? Well, the closest is the closest analogy. In this case, is the 10th Circuit opinion in Smith, Smith versus Inglis O'Rand, where an expert in human factors, Dr. Kearns, was allowed to testify based on review of depositions and discovery materials that Inglis O'Rand failed to conduct an adequate human factors analysis of the milling machine before marketing it. And the court specifically noted, quote, it should be noted that the human factors expert in that case did not possess firsthand knowledge of the particular machine at issue. But firsthand knowledge is not a requisite. It's not an expert opinion, and is cited Dalbert. So there's a variety of factors that need to be considered in any, in any Dalbert analysis. And to go off on one of them that there's not a peer review study and then say, and you didn't do a survey is way too restrictive of an expert. You know, there may be a reason that the expert in Smith should be allowed to testify and Miss Gill should not be allowed to testify. But this the court in this case never gave its reasons why that main opinion of failing to employ the safety hierarchy was not admissible. So we can't this court can't review and say, well, it's one thing in Smith and a different thing in Ryder or Wells, we don't have a factual record where the district court lay that out for us. So we would ask that you want to reserve time or not? Yes, I'll, I'll just say it's an abuse of time. Mr. Mueller. Thank you. Court. This case involves, as Mr. Friedman said, an orifice injury. I think we have to put this in the context that the district court well new orifice injuries were discovered in the field of water skiing back in the late 1980s. And there were medical reports of it. The personal watercraft industry in the early 1990s, learn that such an injury of that kind was also possible from riding personal watercraft, particularly if you fall off at a decent speed and hit the water wrong, just like water skiers do. And at that point in time, the personal watercraft industry started putting warnings on their product, because what the water ski race associations had done to solve that problem was to recommend that particularly at sanctioned events, that the water skiers wear wetsuit bottoms. And so the personal watercraft manufacturers, including Kawasaki, did the same thing because it eliminated all orifice injuries in water skiing events. And, and they made that same same recommendation. And as they as you go on into the 1990s, in the late 1990s, United States Coast Guard, which is the regulatory agency over controls regulates the design of all wanted was interested. And because there are a number of different personal warcraft manufacturers, they were interested in all the manufacturers standardizing, you know, so they're all giving the same on product warnings. And so they, they hired a professor from the University of Michigan, and the group got together and together with United States Coast Guard and came up with what Mr. Friedman referred to as the uniform label. The uniform, may I ask you a question there? Are you essentially arguing a pre a label preemption then on the part of the Coast Guard or? I'm, I'm not your honor. What I what I am arguing is that if you're faced with every federal agency that's looked at it, if you're safety organizations that looked at it, the National Association of State Boating Law Ministers, even the state of Utah, Utah, includes the same warning in its boat safety course, anybody who takes a boating safety course in Utah is told this given the same instruction. So when you're faced with a unanimous 20 year long consent, consensus from all these organizations, that this is the way to address this risk. And then if you and if Miss Gill comes along and says she reads the warning label, and reads four depositions that the plaintiff's attorney gave her, all of whom had a vested interest in the case. And you know, there were over 20 witnesses here, but she didn't read any of the rest of them. So she reads these four depositions, does no other work whatsoever, and says, you know what, all those other guys, they got all wrong. This warning is no good. It's never gonna make a difference. And, and so anybody using this, even though the Coast Guard asked them to, is, is, is negligent and is at fault. So did you have an expert of your own? Yes. And was your expert going to say that the use of this label was the generally accepted way to deal with it? Yes, you would. All right. And so your position would have been, I assume before the district court that Miss Gibbs position was not generally accepted. Miss Gibbs position was not generally accepted. And that the that the publication and peer review on the issue were actually contrary to what her position was. Correct. There's several public peer reviewed articles. Matter of fact, there's a kind of a horn book of four warnings put out by a professor in North Carolina who includes as one of his examples of how to do it right. This exact one. All right. And that Miss Miss Gibbs testimony you would you would argue then you know, violated existing was was contrary to existing standards in the industry. I would certainly argue that it was not generally accepted. And I certainly would say that when the when the Coast Guard brought up this idea of having a standardized label, it would be contrary to the position taken by the United States Coast Guard and the position taken by the National Boating Safety Advisory Council that advised the Coast Guard and safety matters. I mean, those are those are existing standards of some I mean, they may not be the only position on the issue, but and they may not be binding, you But those are standards that at least two organizations have set forth. Oh, and NASBA, which is the National Association of State Boating Law Administrators also endorses this label, they used it as the basis for their uniform runners checklist and which includes the exact same warning. So it's contrary to all  Are you aware of any organizations or, or governmental entities that have expressed the opinion that the seats on these watercraft should be redesigned? No. And in fact, as it as it certainly came up in this Gil's deposition, all the personal watercraft manufacturers have what they call, you know, a sport seat. And what color Kelly's Kawasaki refers to as a luxury seat. I mean, for the kind of I'm just going to ride from here to there, you get the more cushy, you know, luxury seat. If you're more of an I mean, you can, you can go out on the highways and see those motorcycles or people all down, you know, crunch down and race like that. Most things all have relatively speaking, flatter seats. But if you look at those Harley Davidson's where you're kind of riding up like this, nice big, cushy, soft seats, it's a, it's a common phenomenon in a lot of recreational products. And can I ask you a question on the warning? And it's one thing you're a Coast Guard employee. And here we have a 16 year old girl who's on a family vacation at a remote location. Not a lot of buy sort of shops probably at Lake Powell, along the canyon side. Does that matter? I mean, she reads the let's say that she's a 16 year old who bosses her parents around. She reads a label and says we're not using this product until we all get wetsuits. That's just so implausible. Is she just left to her own devices? In other words, if there's a seat that would protect her, why would we rely on a warning? Well, number one, she is out there with, you know, with a lot of parents. I mean, she was a minor at the time. And, and I actually assume was originally filed by her mother who was out there. I mean, so, I mean, partly, you know, parents are the ones that are be, you know, looking at warrants, we're not going to do that. But number two, I mean, there are a lot of situations in America with lots of products where you give warnings and you're not so-called designing it out. For example, if you open up your car manual, it's going to tell you as probably most moving products do, don't drink and drive. Now, I looked on the internet, I mean, you can probably buy a breathalyzer for about five, 10 bucks. You can plug that into the front dash, and you won't have to worry about people don't drink and drive. And then the engine doesn't start. And there's dozens of examples in which we as a society and our government as regulators have concluded that warnings are an adequate solution to the problem. Particularly, it's something where, you know, I mean, how about motorcycles? You tell people to wear a helmet. I mean, I suppose with Bluetooth technology, you could put a Bluetooth in the helmet, a Bluetooth on the handlebars, and the engine won't start until you've got it. It's doable. But we have a society have decided that certain things particularly for protective equipment, you know, where you've got to have the gear before you go, that that's a particular place in which warnings are the appropriate response. You need a helmet, or you need gloves, or you need a wetsuit bottom, tell before they go. And I think that you could, you know, you could think of dozens of situations in which you could design out. I mean, think about all the chainsaws and lawnmowers where they're supposed to be wearing eye guards, same thing, Bluetooth, it's not going to come on until you've got it on. I mean, all kinds of protective gear, the usual and typical fashion that American society, you know, responds to that as you tell them, in advance, you know what to do, you put a warning on the product, you put a warning in the manual. You know, as our briefs made clear, these, they weren't just told once. I mean, the rental people were told, it's in their manual, it's on the product, we had a DVD and a videotape, you know, their, this message was delivered half a dozen times to anybody who would listen. But again, that here, you know, fundamentally, if you look at these two experts, you have one person who basically was flying in the face of 20 years of consensus that this is the way to solve this problem, does absolutely nothing other than read the four depositions that the finance attorney gave her, who are all had kind of had a stake in the case. And, you know, and looked over the manuals and said, Okay, I'm ready to testify. That's not science. I don't want to interrupt your flow here. But the trial court didn't disallow Miss Gill for all the reasons you're saying. What he said is Miss Gill may be an expert on labels and safety warnings, but she isn't a label, but she's not an expert on jet skis. Wasn't that the basis of the court's denial of her as an expert? No, I would say my question to you is, if somebody is a profound expert on oncology, but the expert does has not had experience with some new rare ailment, can that expert be disqualified on oncological matters? Because, quote, he she doesn't have experience in that little with that limited example of illness or malady. But that's exactly what this court held in the city of Hobbs, for example. Well, it may be so walk us through that, because that's what I'm interested in hearing. Yeah, no, I mean, I think what what the what the court actually held in her case, was that she had a lot of general knowledge about sort of human factors, but she had specialized knowledge. This court has held many times that, you know, just generalized knowledge does not qualify you to testify that you have to have specialized knowledge. She had well, this is specialized in labels and warnings. It isn't special specialized with respect to this particular product. What what Daubert was interested in getting rid of in the science, people who came up with some crazy theory about a some scientific issue, and then talk mumbo jumbo and psychobabble. And then voila, this is a violent for some reason that would not be generally accepted by experts in the field. So the test here for us is, is this a person that would be recognized as an expert in the area of notice and warnings, such that she should be allowed to testify? That's my question. But it seemed to me that the district court may have gone too far in requiring specific expertise with respect to a specific product. And on that point, you were going to give me the name of a case and argue that case and said Hernandez. It was a city of Hobbs where you said generalized. City of Hobbs, a guy was was a it was well, that's a but that's generalized. That's somebody coming in, talking general nonsense when you're talking about notice and warnings. But it's got to be the testimony has to relate to this case. I mean, you just can't come in and say, here are five general principles. Well, worries, I'm done. I mean, because it has to have the purpose of Albert is not to test the witness's knowledge on the particular case, but as a preliminary matter to determine whether the witness entertains expertise in the area in which that witness. Is is going to be offered to testify, but even even the old literature that she cited in her report, she said a bunch of research has been done on warnings and one, for example. And this is also kind of common sense. If I could put a warning on a hammer, most people won't read it. Hammers are simple. They understand what the dangers are. So they're going to pick up the hammer. They're going to use it. If I put a warning on a chainsaw, on the other hand, it seemed like and I certainly hope most people are going to go, oh, dangerous. This is I might not be familiar with. I'm going to read those warnings. So whether warnings are read or not read, even according to her own literature, is a function of what the product is. She did nothing in this case at all to figure out whether personal Warcraft people read labels, don't read labels. She wants to come in and say, well, because the product basically is fundamentally safe and people don't tend to read because it makes it more like a hammer, according to her. But but she's done nothing to make that science. He's just it's an off the cuff. It's more like a hammer than it is a chainsaw. And that's and that's where she's got no testing and she has no specialized knowledge. And there's a difference between a warning on a chainsaw than it is on a hammer. And even her own literature supports that notion. And I think that's where Judge Nuffer was going is it's not that she has to be a jet ski rider, but if if the consumer's willingness to read and abide by warnings, the function of the product, you've then you've got to either you either have to know something about the product or you've got to get some science that relates to the product. And that's something that she just didn't do. Thank you, girls. Well, speaking of science, why would Dr. Kaspekar's testimony not help the jury? I'm not saying it wins the case. You're going to be able to cross examine that expert. And by judging from your brief, you're going to score some points. But what we're talking about, what all that he's his testimony is about is basically laws of physics. And then using this furniture bag with the spandex nylon and saying this seat, you're more apt to slide because Isaac Newton told me so. Well, what's wrong with that? Then you can attack why that's no good and why she would have fallen off otherwise or whatever else. But it it helps the jury incrementally, doesn't it? Why not? Number one, he did a test, which he admits, you know, nobody else in the world has ever done before. And if you look at the data, it's it's particularly but only did three tests in each seat. And it's suspicious. Number two, he making the assumption that people slide off. He looked at an animation that actually tends to any relied on. It tends to refute that fact. But that's a that's a gap. But even if you do assume that they slide off, he wants to make the third assumption that that slide off is going to be delayed. It's going to be slowed by the added drag of, you know, bigger bumps have create more drag and smaller bumps. And it's going to be slowed. OK, but then the jury is going to say, well, so what? Well, if that slowing is greater than a normal person's reaction time, which he says is more than the one and a half to three second that's of the use in car cases. But he didn't measure how much slowing there was going to be to know whether it's greater than the reaction time or not. Then he wants to say, and this is his final conclusion. Then if it is greater than the reaction time, then it might give the consumer an opportunity to react, to grab something. Now, the fundamental problem there is the only the fundamental only witness he relies on is Nicole Ryder. And her testimony was that she was hanging on super tight and screaming in Iran. So there's no more. She's needed. She's already clinging on to something. And so the the ultimate conclusion that it might give you time to react. He's speaking about a person who already reacted. And so the the ultimate conclusion can't possibly be helpful to the jury because first of all, because there's there's three or four analytical gaps before you get there, none of which he tested. And just just a quick question on my part is presiding here. I don't mind my colleagues asking questions as long as they want. But I do mind when counsel don't look at the clock now and then and to have some acknowledgement that they're going over. Go ahead. Answer the question. But but this is not an opportunity for a 25 minute speech is what I'm saying. I apologize, your honor. All right. That's all right. I'm more than I'm more than more than done. Seems to me that if you have a this so-called luxury seat and somebody's trying to ride side saddle or back saddle with the jet skier, that that's going to be pretty well precluded. I mean, it's or you do that. It's going to make the situation more dangerous rather than less dangerous. Was there anything in the record that tells us about these writers that jump in the back of a seat? I mean, in terms of whether the more the luxury seats or whether they're more dangerous or not. Allow it, allow it. I think all of all the personal watercraft manufacturers offer both luxury style seats and I understand. That wasn't my question. All right. I think we understand the case. It's let's hear from you, counsel. You had some reserved time here. Thank you, your honor. Let me start by saying I had an extra. Well, we'll add not as much time as your opponent took. But we'll add an extra minute. How's that? Generosity like that made America great. Let me start by saying the district court did not find the doctor. Kaskamar's testimony would not be helpful to the jury. He ruled that he was not a reliable witness because he didn't test it or peer review it. He did not. Isn't that the same thing? I mean, isn't that what makes it unhelpful is that it's not reliable? Well, that's not what Mr. Miller just argued. He said it was unhelpful because it wasn't relevant, not that it wasn't reliable. So it's a it's a problem. It's a problem arguing the other side of that, too, saying, well, it may have been unreliable, but it would have still been helpful. I think that's the purpose of Daubert is to prevent unreliable testimony from confusing the jury. Right. And I would agree with that. And I think Daubert has its place. But a rigid application is is is schooled against by the Supreme Court. And that's what we have in this case. Returning to Miss Gill, she read more than four depositions. She actually read the depositions of the people who rented this personal watercraft to the party that was brought it to the lake. And those people worked around this label day in and day out for over 10 years. And they didn't appreciate the risk. And that's in the that's in the record. Didn't those didn't those people acknowledge that they were aware of this injury? Aren't they part of the crowd that called it a Lake Powell enema? They had heard of such a thing as a lake. Emma, one of the witnesses did, but it wasn't sure what it meant. But the record is very clear by Mrs. Lakota that she she was unaware that somebody could experience an injury like this by falling off a wet ski, a wetsuit, a jet ski, and they don't offer wetsuits or even wear them themselves. Now, the whole hammer versus chainsaw analogy on warnings is why we have juries. Certainly, Kawasaki is allowed to argue their theory of the case. But Miss Gill's theory is is just as acceptable. And she go to the jury as well and let them solve the problem of which which makes more sense on these facts. Warnings are an acceptable response to some situations. And what what what was the relief that you saw apart for the monetary damages to your client? Would you have it that there be no jet skis? Would you have it that the warnings just scream you're crazy if you get on this thing? What's the relief you want? The only relief available to Miss Wells is is monetary relief. What we would hope that would happen is if the manufacturers were forced to pay for the damages caused when people were injured using their products, that they would go back and evaluate the design to make sure that less people were injured and that they would have to pay less in compensatory damages. That's this one of the theories of the tort system is products get safer if they have to pay for the damages they've done. One last very important point I'd like to make, your honor, is there is evidence and it's cited on page 33 of our opening brief that the science is consistent with what Miss Gill testified generally about warnings and specifically for jet skis. The article we cite said, and I quoted this portion, even with the provision of adequately composed and adequately located orifice injury warning for passengers and operators, using warnings as the only remedy for the risk of very serious orifice injuries is inadequate from a human factors and safety standpoint. That study cited it's in the record. And it's Miss Gill is not an outlier arguing against 20 years of established science. The published literature. Were there other questions for my colleagues? Judge, I did have one question for him. The article you're talking about was was was her reliance on that article presented to the district court? That article was presented to the district court. She did not specifically say, I'm relying on this article. OK, so you as part of your argument presented it to the district court, but as part of her expert report or testimony, she didn't acknowledge that article. Right. And she she did analysis. She came up to her conclusions. The article did an analysis, came to the same conclusion, and we pointed that out to the district court. OK, thank you. Thanks. All right. The case is submitted to counsel are excused.